UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL DOPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 5077 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| JAMES CORCORAN, REX FIELDS, ) | |
| DEBORAH MARSICO, and ERICA WARE ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Between 2016 and 2019, Plaintiff Michael Dopson was a patient at Chicago-Read Mental Health Center ("Chicago-Read"), where Defendants James Corcoran, Rex Fields, Deborah Marsico, and Erica Ware worked. On July 27, 2019, Dopson filed a complaint alleging that Ware sexually abused him during his treatment at Chicago-Read. Dopson claims there was wide-spread knowledge of the abuse and Defendants took no action to prevent it. Dopson's complaint includes § 1983 claims for excessive force and battery (Count I) and false imprisonment (Count II), both in violation of the Fourth and Fourteenth Amendments. Defendants filed a partial motion to dismiss Dopson's complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court dismisses the false imprisonment claim, as well as Dopson's claims against Defendants Fields and Corcoran. The Court also dismisses Dopson's request for injunctive relief. Dopson may proceed to discovery on his excessive force and battery claim and a substantive due process claim based on unconstitutional conditions of confinement against Marsico and Ware.

## BACKGROUND[1]

In June 2016, a state court adjudicated Dopson not guilty by reason of insanity ("NGRI") and committed him to state custody for inpatient mental health treatment. Initially, MacFarlane Mental Health Center provided his treatment, but on November 23, 2016, Dopson moved to Chicago-Read. At Chicago-Read, Fields was a social worker, Marsicol was an administrator, Ware was a Mental Health Tech, and Corcoran was the senior administrator and supervised Ware, Fields, and Marsicol. Upon his transfer, Dopson became acquainted with Ware. Within two weeks of Dopson's arrival, Ware began to sexually seduce him. On one occasion in late November or early December 2016, Ware watched Dopson while he stood on a chair and hung party decorations and said, "while gazing at his pelvic area, 'I'm looking at something . . . and I might want to touch it.'" Doc. 1 ¶ 3. That night, Dopson and Ware met in the unit's back room and kissed. Ware proceeded to visit Dopson's room daily, kiss him, and attempt to initiate sexual intercourse. Although Dopson initially protested, by December 2016, they were frequently having sexual intercourse, often in the laundry room.

At some point before December 25, 2016, Ware suggested that if Dopson had money, she could buy him a cell phone so they could have phone sex. Dopson gave Ware money, and she bought him a cell phone. Chicago-Read regulations prohibited patients from possessing cell phones, so Dopson kept his hidden. Throughout January 2017, Ware and Dopson had frequent phone sex. Dopson also used his phone to encourage others to visit him. Several visitors were young women, which the security staff noticed, leading one guard to ask Dopson to "hook him up" with one such visitor. *Id.* ¶ 6. Complaints, reports, and rumors circulated at Chicago-Read about Dopson's popularity with women. Soon it seemed that everyone knew Dopson and Ware

---

[1] The facts in the background section are taken from the complaint and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

were having sex, and one patient reported this to the head psychologist. Dopson's friend reported that he had a cell phone, and in mid-February 2017, Chicago-Read searched Dopson's room and confiscated his cell phone. The following week, Dopson had several meetings with staff regarding the cell phone. Corcoran primarily questioned Dopson about how he obtained the cell phone. "From Defendant Corcoran's tone and the nature of his questions, it was clear to [Dopson] that other unknown staff knew he had gotten the cell phone from Defendant Ware, and that they knew he was having sex with her." *Id.* ¶ 10. Nonetheless, Dopson denied the relationship and lied about the source of the phone.

In February 2017, Ware gave Dopson a Valentine's Day card, expressing that "[g]etting to know and learn you these past couple of months has been quite the experience" and "[r]egardless of whether we work out later on in life or not you will always hold a special place in my heart." *Id*. ¶ 12. The card concluded: "I don't know what lies in the future, but one thing I do know is I can see you in it." *Id.* The two continued their relationship until the facility transferred Dopson to a minimum security clinical unit on August 4, 2017. Ware performed oral sex on Dopson the night before his move. At some point in spring or summer 2017, Ware collected a $10,000 refund from Dopson's defense lawyer, which Dopson used in part to fund a birthday party for Ware's daughter.

Upon Dopson's transfer, staff and patients began treating him like a "trouble-maker" despite his positive record. *Id.* ¶ 16. Fields tried to set Dopson and other patients against each other, ultimately leading to an argument between Dopson and another patient. Additionally, an unknown staff member informed Dopson's girlfriend and mother of his children that he was having sex with female staff. This provoked an altercation between Dopson's girlfriend and another female visitor, both of whom visited on March 29, 2018. According to Dopson, Fields

3

and his team seized upon these incidents to forego recommending his conditional release to the court. On March 30, 2018, the facility transferred Dopson to a different clinical unit due to his argument with another patient and the "failure of [his] treatment team to reasonably advocate for his conditional release." *Id.* ¶ 20. "Thus, Plaintiff was unlawfully imprisoned for at least an additional six months." *Id.* Dopson was released in March 2019.

Two months later, Dopson filed a complaint regarding his treatment at Chicago-Read. Dopson claims that "all of the named individual defendants committed individual acts, actively or passively, to wrongfully hold the Plaintiff against his will at Chicago-Read, to disable him, and to thereby make him available, at Defendant Ware's disposal, for her own personal, perverted purpose of sexual abuse, whether he was mentally ill and dangerous or not." *Id.* ¶ 22. Dopson claims that Ware emotionally and sexually abused him, this was widely known, and no action was taken, enabling Ware's continuous authority over him. As a result, Dopson "naturally concluded that he had no choice but to continue the sexual relationship which he had not initiated, or else be 'diagnosed' and more heavily drugged and confined for complaining about these violations of his rights." *Id.* ¶ 24. Dopson's complaint includes claims for excessive force and battery and false imprisonment, both in violation of the Fourth and Fourteenth Amendments. However, both claims largely repeat the same allegations relating to his treatment at Chicago-Read. Defendants filed a partial motion to dismiss Dopson's complaint.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in

4

the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

Defendants advance multiple arguments as to why the Court should partially dismiss Dopson's complaint. First, Defendants argue that the Court should dismiss Dopson's complaint to the extent it alleges Fourth Amendment violations because the Fourth Amendment does not apply after civil commitment. Defendants also argue that the Court should dismiss Dopson's false imprisonment clam (Count II) because the *Heck* and *Rooker-Feldman* doctrines bar the claim and Dopson has otherwise failed to state a claim. Defendants next argue that the Court should dismiss Defendants Fields and Corcoran because the complaint does not contain sufficient allegations regarding their involvement in the alleged tortious actions. Finally, Defendants ask the Court to dismiss Dopson's request for injunctive relief because his injury is hypothetical and conjectural.

### I. Excessive Force and Battery (Count I)

Defendants argue that the Court should dismiss Count I to the extent it alleges a Fourth Amendment violation because the Fourth Amendment does not apply following Dopson's commitment. Dopson responds that Defendants' failure to detect, report, and prevent his sexual abuse violates both the Fourth and Fourteenth Amendments. "The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."

5

*Manuel v. City of Joliet, Ill.*, --- U.S. ---, 137 S. Ct. 911, 917 (2017). Whereas "[t]he Fourteenth Amendment's guarantee of due process is triggered when the state deprives a person of 'life, liberty, or property.'" *Beley v. City of Chicago*, 901 F.3d 823, 826 (7th Cir. 2018) (quoting U.S. Const. amend. XIV). The Supreme Court has held that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." *Manuel*, 137 S. Ct. at 920. However, Dopson's excessive force claim centers on his treatment during detention, rather than the fact of his detention. *See, e.g.*, Doc. 1 ¶¶ 55, 56 (alleging that he had a constitutional right under the Fourth and Fourteenth Amendments to bodily integrity and to be free from sexual assault and abuse). The due process clause of the Fourteenth Amendment prohibits the use of excessive force against individuals committed after being adjudicated NGRI. *See Green v. Beth*, 770 F. App'x 273, 275 (7th Cir. 2019) (explaining that "[t]he Fourteenth Amendment governs a state's obligations to pretrial detainees" and evaluating the pretrial detainee's deliberate indifference claim under the Fourteenth Amendment); *Webber v. Hussain*, No. 14 CV 5987, 2016 WL 2958370, at *4 (N.D. Ill. May 23, 2016) ("[A]n involuntarily committed patient is in the same position as a pretrial detainee in the context of an excessive force claim under the Fourteenth Amendment."); *see also Cates v. Manning*, No. 19 C 5248, 2020 WL 1863299, at *1 (N.D. Ill. Apr. 14, 2020) (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and explaining that the due process clause prohibits excessive force against pretrial detainees). Therefore, the Fourteenth Amendment, rather than the Fourth Amendment, applies to Dopson's excessive force claim. *See Hurt v. Corcoran*, No. 17 C 7909, 2019 WL 3842819, at *11 (N.D. Ill. Aug. 15, 2019) (even if the Fourth Amendment allowed persons adjudicated NGRI to challenge the fact of their detention, it did not allow them to challenge their treatment during detention); *Johnson v. Schuyler Cty.*, No. CV 16-4204, 2019 WL 2778084, at *2 (C.D. Ill. July 2, 2019) (evaluating a

civil detainee's excessive force claim under the Fourteenth Amendment); *see also Webber v. Pharis*, No. 14 CV 5987, 2015 WL 475956, at *4 (N.D. Ill. Feb. 3, 2015) (finding that "[n]either the Supreme Court nor the Seventh Circuit has directly addressed whether the involuntarily committed may seek relief under the Fourth Amendment for claims of excessive force" and determining that the due process clause governs such claims); *Escobar v. Obiakor*, No. EDCV 06-693-GW CW, 2010 WL 6714066, at *3 (C.D. Cal. Sept. 29, 2010) (excessive force claim brought by person adjudicated NGRI should be evaluated under Fourteenth Amendment as applied to excessive force claims brought by pretrial detainees). This is of no consequence, however, because Dopson has also pleaded his excessive force claim under the Fourteenth Amendment.

## II. False Imprisonment (Count II)

Defendants raise multiple arguments as to why the Court should dismiss Dopson's false imprisonment claim. Defendants contend that the Fourth Amendment also cannot provide a basis for Dopson's false imprisonment claim. Defendants further argue that the *Heck* and *Rooker-Feldman* doctrines bar this claim, and in the alternative, Dopson has otherwise failed to state a claim for false imprisonment.

### A. Fourth Amendment Violation

Defendants argue that Dopson cannot assert a Fourth Amendment violation following his commitment. "Recent precedent on the constitutional provisions governing pretrial detention suggests that pretrial detainees, and thus the involuntarily committed, may challenge the fact of their detention under the Fourth Amendment." *Hurt*, 2019 WL 3842819, at *11; *see also Manuel*, 137 S. Ct. at 920 (overturning Seventh Circuit precedent requiring a pretrial detainee to bring a § 1983 challenge to pretrial detention under the due process clause); *Lewis v. City of*

7

*Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) ("[T]he Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention."). In *Hurt*, the plaintiffs, also adjudicated NGRI, argued that they were unlawfully held in civil commitment when they might otherwise be eligible for release or transferred from the facility. 2019 WL 3842819, at *11. The court concluded that "[t]o the extent that Plaintiffs argue that their detention . . . was caused by the Defendants' actions or inactions, Plaintiffs' claim may be cognizable under the Fourth Amendment." *Id.*[2]

Similarly, here, Dopson seems to argue that based on Defendants' actions, he was unlawfully held in civil commitment when he otherwise may have been eligible for conditional release. Dopson's claim arguably challenges the lawfulness of his detention.[3] Therefore, the Court denies Defendants' motion to dismiss on this basis and proceeds to analyze whether the *Heck* or *Rooker-Feldman* doctrines bar Dopson's false imprisonment claim. *See Anderson v. La Penna*, No. 18 C 6159, 2019 WL 1239667, at *3 (N.D. Ill. Mar. 18, 2019) (finding the plaintiff stated a viable Fourth Amendment claim under *Manuel* unless it was barred by *Heck*).

### B. The *Heck* Doctrine

Defendants argue that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Dopson's false imprisonment claim. *Heck* instructs that when a plaintiff seeks damages in a § 1983 suit, the Court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. The purpose of this rule is to prevent "collateral attack on [a] conviction through the

---

[2] The Court notes that *Hurt* did not reach the issue of whether *Heck* applied.

[3] The Court reiterates that to the extent that Dopson challenges his treatment during confinement in his false imprisonment claim, this is not cognizable under the Fourth Amendment. *See e.g.*, Doc. 1 ¶ 81 (stating that Defendants' "enslavement of Plaintiff" caused him serious injury).

vehicle of a civil suit." *Id.* at 484 (citation omitted). Because § 1983 is a theory of tort liability, *Heck* reiterates "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486.

As an initial matter, the Seventh Circuit has consistently applied *Heck* to plaintiffs who have been civilly committed. *See Henderson v. Bryant*, 606 F. App'x 301, 304 (7th Cir. 2015) (*Heck* barred civilly committed plaintiff's challenge to recommitment because "successful damages claim would vitiate basis for his commitment"); *Thomas v. Schmitt*, 380 F. App'x 549, 550 (7th Cir. 2010) (citing *Heck* and explaining that a civilly committed individual could not sue for damages under § 1983 unless his commitment has been invalidated); *Flowers v. Leean*, No. 99-2999, 2000 WL 554518, at *2 (7th Cir. May 3, 2000) (same). Courts have similarly applied *Heck* to claims brought by plaintiffs who were civilly committed following a NGRI adjudgment. *See Carter v. Bickhaus*, 142 F. App'x 937, 938 (8th Cir. 2005) (affirming dismissal, based in part on *Heck*, of action brought by plaintiff who was civilly committed after pleading NGRI); *McIntosh v. Taylor*, No. CV 2:17-376-RMG-BM, 2017 WL 3328189, at *3 (D.S.C. June 20, 2017) (*Heck* barred claims brought by plaintiff who was found NGRI and involuntarily committed); *Phelps v. Sabol*, No. CIV.A.07-40147-GAO, 2008 WL 824258, at *2 (D. Mass. Mar. 27, 2008) (*Heck* barred claims brought by a plaintiff who was found NGRI and civilly committed). This Court agrees that *Heck* may apply to plaintiffs who are civilly committed based on a NGRI adjudgment and therefore rejects Dopson's contrary suggestion. Although Dopson's commitment is civil in nature, it still arises out of a criminal finding, and Dopson cannot challenge that commitment unless it is no longer valid. In other words, Dopson cannot use a civil vehicle to undermine a state court's criminal NGRI finding and subsequent commitment.

9

Additionally, Dopson argues that *Heck* is inapplicable because he "does not in fact claim that he was wrongfully detained at [Chicago-Read] to begin with, or that any court was mistaken in finding him in need of mental health treatment." Doc. 14 at 5. However, the complaint alleges that Defendants interfered with Dopson's ability to receive conditional release and thereby falsely imprisoned him. Doc. 1 ¶¶ 19, 20. This directly challenges the state court's determination of the proper commitment term. And under Illinois law, the state court retained control over assessing Dopson's eligibility for conditional release. *See* 730 Ill. Comp. Stat. 5/5-2-4(e); *cf. Nadzhafaliyev v. Hardy*, 403 F. Supp. 3d 663, 668 (N.D. Ill. 2019) ("[T]he conditions of plaintiffs' confinement are subject to state-court supervision, to the extent that they impact the treatment process."); *Singleton v. Staples*, No. 98 C 6310, 1998 WL 809003, at *4 (N.D. Ill. Nov. 17, 1998) (noting the "continuing jurisdiction of the criminal court judge over an NGRI acquittee that he or she has committed to a mental institution"). Dopson has not shown that the state court invalidated his commitment, and until he does so, *Heck* bars him from challenging the commitment itself. Dopson must raise his allegations regarding Defendants' interference with his ability to receive conditional release before the state court determining his release. In conclusion, *Heck* bars Dopson's challenge to the length of his confinement, including the failure to receive conditional release, because it directly disputes the length of his civil commitment, as determined by the state court.

Comparatively, Dopson's claims regarding the conditions of confinement receive different treatment. See *Wilkinson v. Dotson*, 544 U.S. 74, 83–84 (2005) ("*Heck* uses the word 'sentence' to refer not to prison procedures, but to substantive determinations as to the length of confinement. . . . [T]his Court has repeatedly permitted prisoners to bring § 1983 actions challenging the conditions of their confinement."). Dopson alleges that his improper treatment at

10

Chicago-Read amounted to false imprisonment. *See, e.g.*, Doc. 14 at 3 ("[F]rom the day he was first sexually abused by a state employee whose job was to treat or facilitate treatment of his mental illness, treatment ceased to occur or to even be possible; his involuntary commitment was thereafter an illegal false imprisonment."). Although it is not clear how this amounts to false imprisonment, the Court could read these allegations to give rise to a substantive due process claim for unconstitutional conditions of confinement. *See Hurt*, 2019 WL 3842819, at *12 (concluding NGRI plaintiffs adequately pleaded substantive due process claims where they alleged sexual abuse during civil commitment). *Heck* does not bar such claims because they challenge the conditions, rather than the commitment itself. *See, e.g.*, *Schloss v. Wilczynski*, 694 F. App'x 1020, 1023 (7th Cir. 2017) (concluding *Heck* did not bar a civil detainee's claim that he was not receiving constitutionally proper mental health care). Defendants do not address the viability of a substantive due process claim, and these allegations seem to support one. *See Hurt*, 2019 WL 3842819, at *12. Accordingly, the Court dismisses Dopson's false imprisonment claim insofar as Dopson challenges the civil commitment itself,[4] but Dopson may proceed with a substantive due process argument regarding his treatment during his commitment.

### C. The *Rooker-Feldman* Doctrine

In the alternative, Defendants argue that the *Rooker-Feldman* doctrine precludes jurisdiction over Dopson's false imprisonment claim, to the extent he calls for the state court's judgment to be overturned. Dopson again responds that he does not seek to overturn that judgment. The *Rooker-Feldman* doctrine bars federal district courts from asserting jurisdiction over cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and

---

[4] This includes any Fourth Amendment claim that the Court found may provide a basis for Dopson's false imprisonment claim in Part II(A).

rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The *Rooker-Feldman* doctrine applies to claims raised in state court, as well as those that are "inextricably intertwined" with state court determinations. *Swartz v. Heartland Equine Rescue*, 940 F.3d 387, 390 (7th Cir. 2019). Whether a claim is inextricably intertwined turns on whether "the district court is in essence being called upon to review the state-court decision." *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 533 (7th Cir. 2004) (quoting *Ritter v. Ross*, 992 F.2d 750, 754 (7th Cir. 1993)). If a claim is so intertwined and the plaintiff had a reasonable opportunity to raise it during the state court proceedings, the claim is barred. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017). To establish that he did not have a reasonable opportunity, Dopson must point to "some action taken by the state court or state court procedures in place" that formed a barrier to him presenting the claims in state court. *Taylor*, 374 F.3d at 533 (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 558 (7th Cir. 1999)).

Defendants argue that any claim that Dopson was wrongfully detained in violation of the Fourteenth Amendment would require a determination that a state court was mistaken in finding him in need of inpatient mental health treatment. As discussed, Dopson challenges his civil commitment because he could have received a conditional release. Although Illinois law entitled him to petition for conditional release, he did not do so. Dopson now contends that he was civilly committed for too long, but this challenges the state court's decision to civilly commit him. Moreover, the conditional release determination is inextricably intertwined with the court's initial commitment adjudication because it relates to whether ongoing civil commitment was proper. Therefore, the *Rooker-Feldman* doctrine bars this Court's assessment as to whether Defendants falsely imprisoned Dopson by failing to advocate for conditional release and provides another basis for the Court's dismissal of this aspect of his false imprisonment claim.

However, Dopson's allegations relating to his treatment during confinement are not inextricably intertwined with the state court's determinations because they relate to the conditions of confinement. *Rooker-Feldman* does not bar such claims. *Cf. O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (*Rooker-Feldman* did not bar an inmate's Eighth Amendment claims against prison medical officials relating to their execution of a state court's force-feed order).

In conclusion, the Court dismisses Dopson's false imprisonment claim as it relates to Defendants' alleged interference with his ability to receive conditional release.[5] Because the remaining allegations regarding his treatment appear to give rise to a substantive due process claim, the Court does not dismiss such claim.

## III. Dismissing Specific Defendants

Defendants argue that the Court must dismiss Fields and Corcoran from the lawsuit because the complaint does not include sufficient allegations specific to either Defendant.

### A. Fields

Defendants argue that the Court should dismiss Fields because the complaint neither alleges that Fields battered or sexually abused Dopson nor that Fields was aware of such actions. Section 1983 creates a cause of action based on personal liability and predicated upon fault, meaning that "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act."). "An official satisfies the personal responsibility

---

[5] Because the Court dismisses Dopson's false imprisonment claim under the *Heck* and *Rooker-Feldman* doctrines, it will not address Defendants' alternative argument that Dopson's false imprisonment claim fails because he does not have a constitutional right to conditional release.

13

required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1012 (7th Cir. 2000) (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)). Dopson's complaint does not contain allegations demonstrating that Fields, his social worker, participated in or had knowledge of the alleged sexual abuse. Instead, the allegations specific to Fields suggest, at most, that he provoked an argument between Dopson and another patient. *See* Doc. 1 ¶¶ 16, 17. Additionally, Dopson's complaint often refers to "staff" generally without specifying who this includes and fails to incorporate allegations specific to individual Defendants. This is insufficient for pleading purposes. *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (noting that the phrase "one or more of the Defendants" failed to adequately connect specific defendants to acts). In his response brief, Dopson alleges that Fields "was actually located on the clinical unit, every day during most hours, where all the alleged activity took place, e.g., in the laundry room of the facility." Doc. 14 at 10. However, this allegation is insufficient for the Court to infer that Fields knew about the alleged sexual abuse.[6] Therefore, the Court dismisses Dopson's claims against Fields without prejudice.

**B.   Corcoran**

Defendants also argue that the Court should dismiss Corcoran because Dopson's allegations regarding Corcoran's knowledge of the alleged sexual relationship are insufficient.

---

[6] Defendants argue that the Court should not consider the additional allegations in Dopson's response brief because they are amendments to the complaint; however, the Court may consider additional allegations consistent with the complaint. *See Lang v. TCF Nat'l Bank*, 249 F. App'x 464, 465 (7th Cir. 2007) (explaining a court may consider additional allegations in a response brief that are consistent with a complaint); *Help At Home Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001) ("'A plaintiff need not put all of the essential facts in the complaint;' he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint." (quoting *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963–64 (7th Cir. 1992)).

As a supervisor, for Corcoran to be liable for Ware's conduct, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). Dopson's allegations are too speculative for such an inference. For instance, the complaint alleges that there was "wide knowledge" of the sexual abuse, Doc. 1 ¶ 24, and "[f]rom Defendant Corcoran's tone and the nature of his questions, it was clear to Plaintiff that other unknown staff knew he had gotten the cell phone from Defendant Ware, and that they knew he was having sex with her," *id.* ¶ 10. But such allegations are insufficient to support an inference that Corcoran was aware of the alleged sexual abuse. And Dopson's allegation that "Defendants actively work to find no fault with staff conduct, and to assure that no fault is found by any outside investigators, so long as any story at all is offered by staff in response to a patient complaint, regardless of how incredible such response is, wherein the Defendants, and each of them, willfully failed to prevent the ongoing sexual abuse of the Plaintiff" is simply conclusory. *Id*. ¶ 44. Again, Dopson responds with facts absent from his complaint, for example about the "narrow, closely confined environment" at Chicago-Read and Corcoran's access to all reports. *See* Doc. 14 at 9. Dopson goes so far as to suggest that the Court should take judicial notice of "this extensive and pervasive power possessed by Defendant Corcoran over the freedom or imprisonment of any patient, through the 'medical treatment' they are subjected to." *Id*. at 12. These allegations are insufficient, and the Court will not take judicial notice. The Court dismisses Dopson's claims against Corcoran.

### IV.     Injunctive Relief

Finally, Defendants contend that Dopson cannot seek injunctive relief because his injuries are conjectural and hypothetical. Dopson seeks injunctive relief "to redress the

15

Defendants' ongoing, continuing deliberate indifference to fundamental human and constitutional rights as described herein, and with respect to their failure or willful refusal to investigate or adequately handle violations of the same." Doc. 1 ¶ 95. Dopson also requests that the Court grant injunctive relief "from all contact or communication by the Defendants, including any further sexual advances, assaults or seductive communication from the Defendants." *Id*. at 23.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by [Article] III of the Constitution by alleging an actual case or controversy." *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 384 (7th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). "[P]ast events are insufficient to establish a case or controversy that would permit the court to enter declaratory or prospective relief." *Hurt*, 2019 WL 3842819, at *7; *see also O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief [ ] if unaccompanied by any continuing, present adverse effects."); *Lopez-Aguilar*, 924 F.3d at 395 (7th Cir. 2019) ("[A] plaintiff cannot seek an injunction 'absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" (quoting *Lyons*, 461 U.S. at 111)). Here, Dopson's allegations involve past events. He is no longer at Chicago-Read and has not alleged any subsequent contact with Chicago-Read or Defendants. Dopson has not made any showing that he will be injured again. Accordingly, the Court dismisses Dopson's request for declaratory and injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court grants in part Defendants' partial motion to dismiss [11]. The Court dismisses the false imprisonment claim (Count II) without prejudice insofar as it challenges Dopson's commitment but allows the claim to proceed to the extent it alleges unconstitutional conditions of confinement. Additionally, Dopson cannot proceed with his excessive force claim (Count I) under the Fourth Amendment. The Court also dismisses all claims against Defendants Fields and Corcoran without prejudice. Finally, the Court dismisses Dopson's request for injunctive relief.

Dated: June 17, 2020

_____
SARA L. ELLIS
United States District Judge