**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DOPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 5077 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| JAMES P. CORCORAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Michael P. Dopson received psychiatric care at the Chicago-Read Mental Health Center ("Chicago-Read") after a court adjudicated him not guilty by reason of insanity ("NGRI") for armed robbery in June 2016. Dopson alleges that Erica Ware, a mental health technician ("MHT") at Chicago-Read, sexually abused him during his period of confinement. After his release, Dopson sued Ware, Dr. James Corcoran, a senior administrator at Chicago-Read, Rex Fields, a social worker at Chicago-Read, and Dr. Deborah Marsico, an administrator at Chicago-Read, for excessive force and battery (Count I) and false imprisonment (Count II) under the Fourth and Fourteenth Amendments.[1] The Court dismissed Dopson's claims against all the defendants except for his Fourteenth Amendment claims against Ware and Dr. Marsico. *See* Doc. 25. Now, Dr. Marsico and Dopson have filed cross-motions for summary judgment.[2] Dr.

---

[1] The Office of the Illinois Attorney General ("OIAG") initially represented Ware in this case. With leave of the Court, on September 23, 2021, OIAG withdrew its representation of Ware after it "determined that the alleged acts or omissions which g[a]ve rise to [Dopson's] claim amount to allegations of intentional, willful or wanton misconduct, and that the conduct alleged would not be within the scope of the defendant Ware's state employment." Doc. 56 ¶ 7; *see* Doc. 61 (granting OIAG's motion to withdraw). Ware has not obtained private counsel, nor has she meaningfully participated in this case—for example, she did not file a response to Dopson's motion for summary judgment against her.

[2] Dopson filed an oversized brief to accompany his motion for summary judgment. Although he filed the brief as an attachment with his motion for leave to file a motion in excess of fifteen pages, he never

Marsico moves for summary judgment on the grounds that no reasonable jury could find her liable for Dopson's claim under a failure-to-intervene theory and that she is entitled to qualified immunity. Dopson moves for summary judgment against Dr. Marsico and Ware, arguing that a reasonable jury had no other choice but to find that Ware violated his constitutional rights by engaging in an inappropriate sexual relationship, and similarly that Dr. Marsico failed to intervene against Ware.

The undisputed facts clearly show that Ware violated Dopson's constitutional rights by sexually abusing him during his time at Chicago-Read. Accordingly, the Court grants Dopson's motion for summary judgment against Ware. However, because no evidence exists that suggests that Dr. Marsico knew about Ware's abuse or that even raises an inference that an objective observer in her shoes would have suspected that Ware was abusing Dopson, the Court denies Dopson's motion for summary judgment on his failure to protect claim and grants Dr. Marsico's motion for summary judgment against Dopson.

The Court also considers Dr. Marsico's motion for sanctions against Dopson's attorney, Mr. S. Randolph Kretchmar, pursuant to this Court's inherent authority to punish Mr. Kretchmar for filing exhibits containing cellphone data that included non-redacted personal identifying information ("PII") such as home addresses, birthdates, and social security numbers, as well as nude or partially nude photographs of Ware and several other women. Dr. Marsico also contends that Mr. Kretchmar contested Dr. Marsico's emergency motion to seal the exhibits in bad faith. Mr. Kretchmar does not dispute that sanctions are warranted, agreeing that his unsealed filings were "in retrospect, improper, unethical and unprofessional." Doc. 138 at 1. Because the Court finds that Mr. Kretchmar acted in bad faith both with respect to his initial

---

noticed that motion for presentment before this Court. Dr. Marsico does not oppose his motion. The Court now grants Dopson's motion for leave to file a brief in excess of fifteen pages.

public filing and in his post-filing conduct, the Court grants Dr. Marsico's motion for sanctions,

and assesses a fine, awards Dr. Marsico attorneys' fees incurred for her emergency motion to

seal, and imposes additional sanctions on Mr. Kretchmar.

## BACKGROUND

### I.    Facts Relevant to the Cross-Motions for Summary Judgment[3]

Dopson was a patient at Chicago-Read between November 2016 and March 2019 after a

court found him NGRI on armed robbery charges in June 2016.  Dopson frequently changed

housing units while committed at Chicago-Read.  He initially resided on the A-South unit, which

also housed several deaf patients.  In May 2017, Dopson moved to the C-North unit where he

stayed for about a year before transferring to the J-West unit, where he stayed until his discharge

in March 2019.  Dopson's father died in October 2017.  The supervising court allowed Dopson

to attend the funeral while under his mother's supervision.  At some point when he was out on

parole, he had consensual sex with a woman.  Dopson later requested to undergo tests for

sexually transmitted diseases.

---

[3] In her response to Dopson's motion for summary judgment, Dr. Marsico moved to strike various parts of Dopson's introduction for lack of evidentiary support or because the factual assertions relied on inadmissible evidence.  *See* Doc. 131 at 3–7; *see generally* Doc. 131-1 (challenging specific factual assertions in Dopson's motion for summary judgment).  The Court will not individually parse every challenged fact; as always, it derives the facts it considers for this motion from the Joint Statement of Undisputed Material Facts and additional facts that the parties submitted in their briefs that are supported with citations to admissible evidence from the record.  *See Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material.  Judges are not like pigs, hunting for truffles buried in the record." (internal quotations omitted)); *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010) (non-moving party "must come forward with admissible evidence that demonstrates there are genuine issues of material fact to survive [moving party's] summary judgment motion").  The Court, therefore, has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.

All staff members at Chicago-Read received training on Office of the Inspector General ("OIG") Rule 50 ("Rule 50"). Rule 50 sets out circumstances in which staff members must report abuse to OIG, including physical abuse, sexual abuse, mental abuse, and financial exploitation. Rule 50 also requires staff to report their suspicions of abuse no later than four hours after they learn information leading them to believe that sexual abuse is occurring. It also provides consequences for failing to report abuse in a timely manner.

Ware evidently ignored this training. Dopson and Ware began having sex shortly after Dopson's arrival to Chicago-Read. Ware and Dopson wanted to continue communicating while Ware was outside the hospital and after Dopson's eventual discharge, so sometime in January 2017 Dopson gave Ware money to purchase and smuggle a cellphone into Chicago-Read for his personal use.[4] The rules prohibited Dopson from possessing such a phone. Dopson and Ware would use the phone to "video chat, Facebook, . . . send pictures to each other back and forth," and continued to do so "for about a couple weeks before [Dopson] got caught with the phone." Doc. 125-2 at 21:17–20. Administrators at Chicago-Read learned about Dopson's cellphone after one of Dopson's visitors accused him of possessing it and alleged that Ware smuggled it in for him. After learning about the phone, Chicago-Read security confiscated it until Dopson's release.

A few days after security took Dopson's phone, he met with several Chicago-Read employees, including Dr. Marsico. The group questioned Dopson about how he obtained the phone, and one administrator asked whether Ware procured it for him. Dopson claimed that the

---

[4] The parties' filings indicate that Ware purchased this phone for Dopson in January 2016, instead of January 2017. However, Dopson's complaint alleges—and the undisputed facts show—that Dopson did not arrive to Chicago-Read until November 2016. As such, the Court assumes the parties have made and consistently implemented a typo with respect to the year that Ware purchased the phone. Because neither Ware nor Dr. Marsico raise a statute of limitations defense, this does not impact the Court's analysis.

female visitor who told them about the phone actually smuggled it in herself in a bag of food that she brought for him and denied that Ware was involved. Dopson later testified that he lied to protect Ware, and Dr. Marsico declared that she believed Dopson's story that Ware did not bring the phone into Chicago-Read for him. There is no evidence that any of the meeting participants asked Dopson additional questions about Ware.

During the meeting, Dopson refused to unlock the phone to allow Chicago-Read staff to review its contents because he did not want to implicate Ware as the person who procured the phone for him, and because it would have revealed that he and Ware were having inappropriate sexual relations. Dopson's social worker returned the phone to him the day of his release from Chicago-Read, but told him to erase all data and photographs before he could leave the facility.

Aside from the meeting where administrators questioned Dopson over the cellphone, Dopson and Dr. Marsico infrequently interacted. Dr. Marsico was not Dopson's primary treating psychologist, and she did not have an office in the A-South unit where Dopson and Ware had their sexual encounters. Dopson would see Dr. Marsico as part of a treatment group at the end of each month, and he had occasional one-on-one conversations with her. One such personal conversation happened shortly after Dopson's father passed away. Dopson testified that Dr. Marsico never asked him whether he and Ware were having sex.

On April 17, 2019, a woman who self-identified as Dopson's sister called Dr. Marsico and told her that Dopson and Ware had sexual relations during Dopson's commitment at Chicago-Read. Dr. Marsico, pursuant to Illinois law and in compliance with her Rule 50 training, swiftly reported this information to the OIG. Dr. Marsico declares that she had no knowledge or suspicion of any inappropriate relationship between Dopson and Ware until she received this phone call. She declares that none of Chicago-Read's staff or patients informed her

of any such relationship, nor that she observed anything that would make her suspect sexual abuse, especially because Dr. Marsico and Ware did not have a personal relationship. Dopson testified that he never informed Dr. Marsico that he was having sex with Ware.

After receiving Dr. Marsico's report, OIG investigated the claim that Dopson and Ware had a sexual relationship. However, OIG found it unsubstantiated because Dopson refused to cooperate. Two years later, after Dopson provided his contraband phone to the Illinois State Police ("ISP") to have them forensically extract the erased data, OIG conducted another investigation with Dopson's cooperation. OIG and the ISP interviewed Dopson, Dopson's roommate ("Roommate"), Dr. Marsico, Dr. Corcoran, Fields, and Ware during its inquiry.[5]

During his ISP interview, Dopson claimed that he consented to a sexual relationship with Ware after he noticed her looking at his "private area" while the two prepared for a retirement party. Doc. 125-5 at 7. He said that he and Ware first kissed when they went to a back room to find more decorations. Dopson then reported that Ware said that she could procure a phone so that the pair could communicate while she was not working. Dopson said that Ware sent him nude photographs, and that they had video communications using Facebook Messenger. Dopson told the investigators that he lied to Chicago-Read staff during their meeting with him after security confiscated his cellphone to protect Ware. Dopson said that his sexual relationship with

---

[5] The admissibility of the individual statements contained within the OIG report, Doc. 125-5, depend on what purpose the statements serve. Although the document is admissible as a business record, *see* Fed. R. Evid. 803(6); *cf. Torry v. City of Chicago*, 932 F.3d 579, 586 (7th Cir. 2019) (admitting police report under business record exception), each individual witness' statements are themselves hearsay unless they fall under a hearsay exception or are non-hearsay. *See* Fed. R. Evid. 805 (hearsay within hearsay must have separate exception to be admissible). Thus, Dr. Marsico can use Dopson's statements as evidence for the purpose of her motion for summary judgment, but she may not rely on her own statements to the ISP for the same purpose. *See* Fed. R. Evid. 801(d)(2) (defining "An Opposing Party's Statement" as non-hearsay under certain circumstances). The reverse is also true: Dopson can rely on Dr. Marsico's and Ware's individual statements to advance his motion for summary judgment and to defend against Dr. Marsico's, but he may not point to his own statements for support. Roommate's statements (whether found in the OIG report or as characterized in Dopson's deposition) are inadmissible hearsay for all parties. *See* Fed. R. Evid. 802 (excluding hearsay from evidence).

6

Ware continued even after he lost his phone, and that the two would sneak into the laundry room to have sex. Dopson further claimed that Roommate, who is deaf, walked in on him and Ware having sex, and that Roommate reported this to Dr. Marsico. Dopson then said that Dr. Marsico told Dopson that Roommate told her that Dopson and Ware were having sex. Dopson said that he communicated with Roommate in sign language to tell him to not say anything about seeing Ware and Dopson having sex. Dopson further claimed that Fields mistreated him when he resided on C-North as retaliation for Dopson's relationship with Ware.

When OIG attempted to interview Dopson by telephone after his ISP interview, he said, "You already know what happened, I am not a trick." *Id.* at 8. Dopson then ended the call.

Dr. Marsico told ISP and OIG that she did not know about any sexual relationship between Ware and Dopson until Dopson's sister called her, which she then immediately reported to OIG. She also said that she did not know any of the details of this purported relationship until Dopson named her in this lawsuit.

Dr. Corcoran told OIG that he learned of Ware and Dopson's relationship after Dr. Marsico already reported Dopson's sister's tip to OIG. Dr. Corcoran, who resigned from Chicago-Read in 2018, was no longer affiliated with the institution. Dr. Corcoran told OIG that he had no knowledge of Ware and Dopson's inappropriate activities during his time at the hospital.

Fields told OIG that he did not know about Ware and Dopson's relationship until Dr. Marsico reported it to OIG. Fields denied Dopson's claims that Fields retaliated against Dopson because of Dopson's relationship with Ware.

Ware admitted to attempting to have sex with Dopson during her interviews with ISP and OIG. Ware claimed that it was initially Dopson's idea to have sex, which they attempted to have

in the laundry room. Ware and Dopson eventually had or attempted to have sex three or four times. Ware denied to OIG that she purchased or smuggled in the phone for Dopson, and she claimed to not know how he received or kept it. However, Ware admitted that she called Dopson when she was not working and sent him sexually explicit pictures. Ware said that she knew that her conduct was wrong and that she knew it violated Chicago-Read policy. Ware reported that the relationship with Dopson ended in April 2017 due to Dopson's sexual demands, and that Dopson threatened to share the explicit pictures that Ware sent him if she refused to continue having sexual relations.

The OIG investigation concluded that evidentiary support existed for Dopson's claim that Ware had sex with him, but that no evidence supported a finding that Dr. Marsico neglected Dopson.

## II.    Facts Relevant to Dr. Marsico's Motion for Sanctions

Pursuant to the Court's scheduling order, *see* Doc. 119, the parties filed their respective motions for summary judgment on July 30, 2024. Along with his motion for summary judgment, Mr. Kretchmar filed two exhibits. The second exhibit, which required four separate filings due to its size, consisted of all the data the ISP recovered from Dopson's contraband phone. Unfortunately, Mr. Kretchmar filed this data without redacting PII such as home addresses, birthdates, and social security numbers, Roommate's name, and nude or partially nude photographs of Ware and at least five other women who have no connection to this case.

One day after Mr. Kretchmar made this ill-advised filing, Dr. Marsico filed an emergency motion to seal Dopson's brief and the cellphone data because she noticed that it contained unredacted sensitive information. Mr. Kretchmar filed a brief opposing this motion. Although Mr. Kretchmar admitted that he should have redacted Roommate's name, he denied that a basis

8

existed to seal the full brief and exhibits. Mr. Kretchmar contended that "all of the documents he

has filed as exhibits to his summary judgment motion are freely available from the Illinois State

Police by [Freedom of Information Act ("FOIA")] request, or from the web site of the IDHS."

Doc. 129 at 1. The emergency judge on duty granted Dr. Marsico's motion to seal on August 1,

2024, meaning the public had access to the filing for approximately two days. *See* Doc. 130.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the

pleadings and assess the proof as presented in depositions, documents, answers to

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed.

Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Dr. Marsico's motion for summary judgment, the Court views all evidence in the light most favorable to Dopson, and when considering Dopson's motion for summary judgment, the Court views all evidence in the light most favorable to Ware and Dr. Marsico. *Id.*

## ANALYSIS

### I. Dopson's Motion for Summary Judgment against Ware

The Court begins with Dopson's claim against Ware. He moves for summary judgment against Ware on his claim that she violated his Fourteenth Amendment rights by sexually abusing him. A state employee's sexual abuse of an individual the State places in his or her care violates the equal protection clause of the Fourteenth Amendment. *Cf. T.E. v. Grindle*, 599 F.3d 583, 588–89 (7th Cir. 2010) ("Plaintiffs have offered evidence that would let a jury easily conclude that Sperlik, acting under color of state law, denied the girls equal protection by molesting and abusing them."). Ware confessed to ISP and OIG that she had or attempted to have sex with Dopson multiple times while he was a patient at Chicago-Read. The State of Illinois confined Dopson to Chicago-Read after a court adjudicated him NGRI of armed robbery, and Illinois law makes it a felony for "an employee of a treatment and detention facility [to] engage[] in sexual conduct . . . with a person who is in the custody of that treatment and detention facility." 720 Ill. Comp. Stat. 5/11-9.2(a)(2). Accordingly, no reasonable jury could find in Ware's favor on Dopson's Fourteenth Amendment claim. The Court therefore grants Dopson summary judgment against Ware.

10

II.     **Dopson's and Dr. Marsico's Cross-Motions for Summary Judgment**

Both Dopson and Dr. Marsico move for summary judgment on Dopson's failure to intervene claim.  Dopson's claim arises under the Fourteenth Amendment due to Dopson's NGRI verdict as opposed to the Eighth Amendment, which would apply if Dopson was guilty of criminal charges.  *See Echols v. Johnson*, 105 F.4th 973, 977 (7th Cir. 2024) ("[F]or persons not convicted of a crime, including pretrial detainees and those like Echols who are in the civil custody of a state, the right to protection comes from the Fourteenth Amendment's Due Process Clause.").

The applicable legal framework for a failure to intervene claim in the specific context of a NGRI detainee that a hospital worker has sexually abused is unsettled.  Dr. Marsico's preferred approach follows the Seventh Circuit's logic in *Pittman v. Madison County*, 108 F.4th 561 (7th Cir. 2024), a failure to protect case, which sets out an objective standard.  For Dopson to win summary judgment under this standard, he must provide evidence compelling a reasonable jury to conclude that an objective observer in Dr. Marsico's position would have appreciated the high risk that Dopson and Ware were having sex (and, for Dr. Marsico's part, she must show that no reasonable jury could find that an objective observer would have appreciated such a risk).  *See Pittman*, 108 F.4th at 572 (holding that plaintiff must prove "that the defendants did not take reasonable available measures to abate the risk of serious harm . . . even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious").  The district court in *Hurt v. Javed*— which Dr. Marsico acknowledges provides a superior factual analogy but contends that *Pittman* supersedes—provides an alternative possible standard.  The district court in that case hewed to a "modified deliberate indifference" approach derived from the Seventh Circuit's line of cases

considering the abuse of children in foster care. *Hurt v. Javed*, No. 17 C 7909, 2024 WL 640849, at \*3–7 (N.D. Ill. Feb. 15, 2024). Under this method, Dopson would have to "put forth a case that . . . [Dr. Marsico] actually knew of or suspected the existence of [sexual abuse]" against Dopson. *Id.* at \*4 (quoting *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002)).

For his part, Dopson does not consistently advocate for any specific legal standard. As Dr. Marsico notes in her reply brief, Dopson's motion for summary judgment argues that the modified deliberate indifference standard is appropriate, *see* Doc. 126-1 at 19–20 (arguing that Dopson's claim "could be satisfied if the Defendants knew of *or suspected* the specific risk (that the Plaintiff was being abused), and consciously ignored it or failed to stop the abuse" (internal quotation marks omitted) (citation omitted)), his response to Dr. Marsico's motion accepts an objective standard, *see* Doc. 132 at 8 ("Plaintiffs need not, since *Pittman*, offer proof of a defendant's subjective state of mind."), and he also advocates for a strict liability test, claiming that the "simple fact that [Dr.] Marsico [sic] was [at Chicago-Read], acting in an administrative capacity . . . *throughout* the time when the relevant events in this matter . . . *did* factually occur, evidences her failure to protect [Dopson] from possible mental, emotional or sexual abuse by [] Ware," *id.* at 4. Because "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation," the Court rejects Dopson's passing attempt to impose strict liability on Dr. Marsico without further analysis. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) ("[A]n individual must be personally responsible for a constitutional deprivation in order to be liable, [but] personal responsibility is not limited to those who participate in the offending act.").

Rather, considering the reasoning of the Seventh Circuit in *Pittman*, on the one hand, and the court in *Javed*, on the other, the Court believes that *Pittman* articulates a more appropriate standard for this case. *Pittman* untangled a knot of cases that discussed the appropriate legal standard for a pre-trial detainee's failure-to-protect claim. The Seventh Circuit observed that a discrepancy existed between cases that required "pretrial detainees . . . to prove defendants' subjective awareness of the risk of harm" and others that relied on an objective test. *Pittman*, 108 F.4th at 569. The *Pittman* court resolved this tension by returning to the Supreme Court's decision in *Kingsley v. Hendrickson*, which applied an objective standard to determining the reasonableness of an officer's use of force in the Fourteenth Amendment context. 576 U.S. 389, 392 (2015). Reasoning that no justification existed for introducing a subjective element into a Fourteenth Amendment failure to protect claim, the *Pittman* court described the plaintiff's task as proving "that the defendants did not take reasonable available measures to abate the risk of serious harm to Pittman, even though *reasonable officers under the circumstances would have understood the high degree of risk involved*, making the consequences of the defendants' conduct obvious." *Pittman*, 108 F.4th at 572.

In light of the Seventh Circuit's decision, the Court cannot rely on *Javed* for the substantive law controlling this case. Although the facts in *Javed*, which also dealt with a NGRI patient's sexual abuse at the hands of a hospital caretaker, largely mirror those of this case (there is even significant overlap between the attorneys representing the respective plaintiffs and defendants), the Seventh Circuit's reasoning and ultimate holding in *Pittman* are what controls. *See Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 515 (N.D. Ill. 2018) ("[T]his Court is bound by Seventh Circuit precedent."). *Javed* drew parallels between cases in the foster care context and the NGRI detainee context due to the respective plaintiffs' reduced mental

capacities. In doing so, *Javed* relied on a three-decade old Seventh Circuit case, *K.H. v. Morgan*, that held that foster children in state care had a right "not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser." 914 F.2d 846, 852 (7th Cir. 1990). The *Javed* court also pointed to *Lewis v. Anderson*, 308 F.3d 768 (7th Cir. 2002), another foster care case, which reasoned that "the state's obligations to the plaintiffs arose from the 'special relationship between the state and the individual'" and the state-created nature of the danger the children faced, *Javed*, 2024 WL 640849, at *4 (quoting *Lewis*, 308 F.3d at 773), and reaffirmed that "the plaintiffs [only must] 'put forth a case that the . . . defendants actually knew of or suspected the existence of child abuse in the prospective adoptive family,'" *id.* (quoting *Lewis*, 308 F.3d at 773); *see also id.* (collecting cases discussing how the "Seventh Circuit has continued to apply this modified deliberate indifference standard in the foster care context"). Critically, none of the cases *Javed* cited for support issued post-*Kingsley*. Thus, although *Javed*'s analogies are persuasive and the district court rendered a well-reasoned decision, the Seventh Circuit's reliance on *Kingsley* to hold that an objective standard applies in the Fourteenth Amendment context indicates that this Court should follow a similar path.

To prevail under the objective standard, Dopson must show that Dr. Marsico did not act to prevent Ware's sexual abuse "even though [a] reasonable [official] under the circumstances would have understood the high degree of risk involved, making the consequences of [Ware's] conduct obvious." *Pittman*, 108 F.4th at 572. The question is whether Dr. Marsico's actions were objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley* 576 U.S. at 397. Both parties face a difficult task: a failure to intervene claim typically presents "an issue for

14

the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997).

Dopson's motion falls well short of this high bar. To summarize the admissible evidence with respect to Dopson's motion, Dr. Marsico was primarily a supervisory administrator at Chicago-Read who worked there at the same time as Ware during the period that Ware was abusing Dopson. Dr. Marsico knew that Dopson possessed a contraband cellphone, and she participated in a meeting where an administrator—but not necessarily Dr. Marsico—asked Dopson if Ware smuggled the phone into the hospital. Dr. Marsico believed Dopson's lie that a female visitor snuck the phone through security in a bag of food. After Dopson was discharged from Chicago-Read, Dr. Marsico received a phone call from Dopson's sister that Dopson and Ware had a sexual relationship while he was a patient, which Dr. Marsico immediately reported to OIG.

Although he argues that the undisputed facts show that Dr. Marsico knew about the abuse, his two lines of reasoning rely on either inadmissible evidence or impermissible inferences to reach this conclusion. Dopson's first claim is that Dr. Marsico must have known about Ware's abuse based on "tips from patients about [Dopson] and [] Ware." Doc. 126-1 at 17. The only such "tip" that appears in the factual record is what *Dopson* says that Roommate told Dopson that Roommate told Dr. Marsico. *See* Doc. 125-2 at 36:18–37:13; Doc. 125-5 at 7. As the Court previously noted, Dopson cannot rely on this inadmissible statement to prevail on summary judgment. *See* Fed. R. Evid. 802 (hearsay without an exception is not admissible).

Dopson's second line of argument fares no better. He posits that Dr. Marsico must have known about Ware's abuse "because [Dr. Marsico] asked or was in the meeting where other administrators asked [Dopson] if Ware had brought him the contraband cell phone." Doc. 126-1

15

at 17.  Although Dr. Marsico was indeed in that meeting, the inference Dopson asks the Court to

make is unreasonable, so he is not entitled to it for the purpose of his motion for summary

judgment.  *See Wehrle*, 719 F.3d at 842 (noting that the court must construe all facts in the light

most favorable to the non-moving party and draw all reasonable inferences in the non-movant's

favor).

      With these avenues closed to him and considering the supporting evidence in whole, the

Court cannot find that a reasonable jury must rule in Dopson's favor on his failure to intervene

claim against Dr. Marsico.  Accordingly, the Court denies Dopson's motion for summary

judgment against Dr. Marsico.

      The Court now turns to Dr. Marsico's motion.  Her task is to point to evidence (or the

absence of evidence) such that no reasonable jury could conclude that an objective observer in

her shoes would have known about Dopson and Ware's sexual relationship.  Dr. Marsico argues

that the undisputed facts show that she did not have any knowledge or reason for suspicion of

Ware's abusive conduct toward Dopson, and an objective observer would not have either.  The

facts in support of Dr. Marsico's motion are that she was not Dopson's main psychologist, she

did not have an office in the same unit where Ware and Dopson interacted, Dopson never told

Dr. Marsico about Ware, she had no personal relationship with Ware, Dr. Marsico believed

Dopson's story that a female visitor smuggled in the contraband cellphone, and Dr. Marsico

immediately reported the alleged sexual abuse to OIG after Dopson's sister reported it to her.

Dr. Marsico paints a compelling picture of an administrator who was ignorant to a staff

member's gross misconduct that both the staff member and the victim took lengths to conceal.

*Cf. Thomas v. Dart*, 39 F.4th 835, 843 (7th Cir. 2022) (affirming summary judgment against jail

clerks when they had no reason to suspect that the plaintiff would suffer assault at the hands of other inmates because of the plaintiff's PTSD).

Dopson attempts to challenge this narrative uniformly fall flat. In response to her citations to the Joint Statement of Facts—the very ones that Dopson agreed were undisputed—Dopson poses a series of rhetorical questions that invite the Court to draw inferences that do not enjoy the support of any admissible evidence. For example, in response to Dr. Marsico's point that she was not Dopson's main treating psychologist, Dopson asserts that this is a "self-serving denial [that] is, in fact, evidence that [Dr.] Marsico *admits* she had adequate awareness of abuse." Doc. 132 at 6. Dopson does not explain how Dr. Marsico's characterization of her once monthly group sessions with and occasional individual treatment of Dopson equates to an admission that she knew of Ware's abuse, but it is certainly not a reasonable inference that a jury could make given the state of the record, much less one that this Court will draw. Dopson further argues that Dr. Marsico's presence in Dopson's interrogation about his contraband cellphone "is direct and uncontroverted evidence that abuse of [Dopson] by [] Ware *was* suspected" and that Dr. "Marisco [sic] may have been the administrative staff member who personally originated the specific line of questioning about [] Ware—she does not bother to deny it . . . [meaning] she at the very least noticed the suspicions of other members of the administrative staff which prompted them to single out Ware as a suspect." *Id.* at 7. But this argument similarly rests on impermissible inferences. First, Dopson is not entitled to the inference that Dr. Marsico herself asked the question based on his belief that she did not deny asking the question. Dopson fails to point to other evidence that suggests that Dr. Marsico asked

the question, such as his own testimony given that he was a full participant in the meeting.[6]  The

second inference Dopson makes is that because someone in the meeting—whether it was Dr.

Marsico or another administrator—asked if Ware brought the cellphone into Chicago-Read,

every administrator who attended that meeting should have suspected that Ware was sexually

abusing Dopson and therefore must have reported her to OIG.  But, again, Dopson fails to point

to any evidence that suggests the administrators (or an objective observer in their shoes) would

or should have reached that conclusion based on the information they had at the time.  The

available evidence suggests that the administrator asked about Ware because Dopson's visitor

claimed that Ware smuggled the cellphone into Chicago-Read on his behalf, not because they

knew or suspected that Ware was abusing Dopson in other respects.  The rule Dopson asks this

Court to adopt would essentially require supervisors to launch investigations into whether an

employee is sexually abusing a charge under his or her care any time that employee is accused of

violating a rule with respect to a patient.  Dopson does not point the Court to any cases in the

Seventh Circuit compelling the Court to hold Dr. Marsico to such a high bar.  Without a legal or

factual basis for imposing this strict mandate on those who work at hospitals like Chicago-Read,

the Court will not do so.

Dopson's reliance on Rule 50 is likewise unavailing.  He points to the rule to argue that

because Dr. Marsico received training on what constitutes abuse and how to report it that she

must have been aware that Ware was abusing Dopson, and subsequently failed to report her

knowledge or suspicions to OIG.  But Dopson again starts with the premise that Dr. Marsico

knew about Ware's abuse without pointing to evidence that suggests that she knew or should

---

[6] Indeed, given that Dr. Marsico is one of two individual defendants remaining in this case, the Court wonders why Dopson never deposed her or, if he did, why he did not introduce her deposition transcript as an exhibit.

have known about it.  Moreover, the fact that Dr. Marsico complied with Rule 50 by immediately reporting Dopson's sister's phone call makes it even less reasonable to infer that she would have flaunted her training by ignoring signs of abuse if she observed them in the hospital setting.

Finally, Dopson's argument that Dr. Marsico knew of or should have known of Ware's abuse because Dopson requested testing for sexually transmitted diseases also fails.  Dopson said that he had consensual sex with a woman while under his mother's supervision to attend his father's funeral.  Dopson then claims—without walking the Court through his reasoning—that because Dr. Marsico knew that he was sexually active in this respect means that she should have been suspicious that he was also sexually active while at Chicago-Read.  This is, yet again, not a reasonable inference a jury could make.

Indeed, Dopson's efforts to rebut Dr. Marsico's version of events suffer from the common, fatal defect that he failed to develop an evidentiary record sufficient to survive summary judgment.  The Court already noted the absence of a deposition transcript for Dr. Marsico despite her importance to this case.  Dopson's lackadaisical approach to building evidentiary support for his claims goes further.  Dopson could have located Roommate to procure his testimony about what he did or did not tell Dr. Marsico—he did not.  Dopson could have similarly deposed other staff at Chicago-Read whom Dopson claimed knew about Ware's abusive conduct toward him to raise the inference that their sexual interactions were common knowledge throughout the hospital such that administrators would have been aware of the abuse—he did not.  Dopson could have subpoenaed testimony from Roberts and asked her why she insisted that Dopson wipe the contraband cellphone of its data, and whether any administrators (such as Dr. Marsico) ordered her to ensure that he did so—he did not.  And, if

Dopson diligently investigated this case, he could have interviewed the other administrators present at his interrogation about his contraband cellphone to identify who asked if Ware delivered it to him, and then in turn asked that person if he or she harbored suspicions about an improper sexual relationship between Ware and Dopson (and, further, whether this administrator then disclosed his or her suspicions to Dr. Marsico)—he did not. Dopson must now live with the consequences of his litigation strategy and the resultant inferences that the record does—or does not—support. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (when moving party at summary judgment argues lack of evidence as grounds for judgment, non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case"); *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) ("'[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003))).

In light of the admissible evidence in support of Dr. Marsico's motion—and lack of evidence supporting Dopson's claim—the Court finds that no reasonable jury could conclude that she, or an objective observer, had reason to know that Ware was sexually abusing Dopson and that she then failed to act against the abuse. *See Celotex*, 477 U.S. at 324 (moving party can rely on a lack of evidence to defeat non-moving party's claim). Accordingly, the Court grants Dr. Marsico summary judgment against Dopson's complaint.[7]

## III. Dr. Marsico's Motion for Sanctions against Mr. Kretchmar

The Court finally addresses Dr. Marsico's motion for sanctions. "A district court may impose sanctions under its inherent authority 'where a party has willfully abused the judicial

---

[7] Because the Court finds that no reasonable jury could find for Dopson on his claim against Dr. Marsico, the Court does not address Dr. Marsico's argument that she is entitled to qualified immunity.

process or otherwise conducted litigation in bad faith.'" *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (quoting *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012)). For sanctions to be appropriate, a party must have acted in "bad faith, [in a way that was] designed to obstruct the judicial process, or [in] a violation of a court order. Mere clumsy lawyering is not enough." *Id.* (citations omitted) (internal quotations omitted).

The cellphone data that Mr. Kretchmar published in an unredacted, public filing contained PII such as home addresses, birthdates, and social security numbers, Roommate's name, and nude or partially nude photographs of Ware and at least five other women who have no connection to this case. None of this information was necessary for Dopson's motion for summary judgment. The only relevant evidence from the PII would be the nude photographs of Ware (to prove that Dopson and Ware had an inappropriate sexual relationship), but they were unnecessary because the parties agreed in their Joint Statement of Fact that an illicit sexual relationship took place between the two. *See* Doc. 125 ¶ 15. The remaining information has no relevance to this case. Indeed, the Court questions whether filing the cellphone data was at all necessary, even if Mr. Kretchmar did so under seal, given that Mr. Kretchmar neglected to cite to any of the literal hundreds of pages of the exhibit across any of his briefs, and that his only reliance on the data was to note that it "included text conversations and nude photographs exchanged between Ware and the Plaintiff in January, 2016, which can only be interpreted as proof of an ongoing sexual 'relationship.'" Doc. 126-1 at 15.

Dr. Marsico's emergency motion to seal Mr. Kretchmar's filings presented him with an opportunity to recognize the seriousness of his oversight and work with Dr. Marsico's counsel to remove the PII from public view. Mr. Kretchmar instead chose to oppose the emergency motion on the mistaken basis that the public could access all of the information he uploaded to the

docket by making a FOIA request to the ISP. As Dr. Marsico notes in her motion for sanctions, "personal information contained within public records, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," such as nude photographs, is exempt from FOIA requests, as is "private information" like social security numbers and home addresses. Doc. 135 at 4 (quoting 5 Ill. Comp. Stat. 140/7(c) and 5 Ill. Comp. Stat. 140/7(1)(b)).

In his response to Dr. Marsico's motion for sanctions, Mr. Kretchmar offers a meager apology for what he rightly admits was unprofessional behavior while simultaneously justifying his decision to file the unredacted cellphone data. *See* Doc. 138 at 1 ("Counsel agrees with [Dr.] Marsico [sic] that his unsealed filing of the Exhibits to [Dopson's] summary judgement motion was in retrospect, improper, unethical and unprofessional."); *id.* at 2 ("As for the nude or seminude photographs of Defendant Ware and 'other unidentified women,' counsel might believe that outrage (including from women) should direct toward what was done by the Defendants to the Plaintiff in this matter, not against an effort to shine light on the reality that women can be abusers of men in their custody."). Mr. Kretchmar's approach seriously undermines his *mea culpa* given that he devotes such a significant portion of his filing to railing against Defendants. For example, he complains "that the whole machinery of the State of Illinois is dedicated to minimizing and misrepresenting what occurred," in apparent reference to Dopson's mistreatment at Chicago-Read, while simultaneously downplaying his conduct as "unprofessional, arguably egregious" but that "would never have been done unsealed, but for [Mr. Kretchmar's] effective lack of knowledge" that the cellphone data contained PII and nude photos when he made the filing. *Id.* at 2. Although Mr. Kretchmar "now recognizes that the unsealed filing of [the cellphone data] was offensive and unnecessary," *id.* at 2–3, based on his conduct—including the way Mr. Kretchmar responded to Dr. Marsico's motion for sanctions—

the Court does not believe that he fully appreciates the seriousness of his conduct and the resultant harm that Mr. Kretchmar's error could have caused. Mr. Kretchmar's filing included the full names, home addresses, social security numbers, and other personal information of at least five current or former state employees, including Dr. Marsico and Ware. This put those individuals at risk of identity theft—or worse—if the information fell into the wrong hands. Moreover, the women whose nude or partially nude images appear in the cellphone data experienced a violation of their privacy and now needlessly bear the risk that individuals whom those women did not intend to have the pictures are able to view them. These are serious breaches of privacy, and it frankly shocks the Court that Mr. Kretchmar "had either forgotten or never noticed that the 677 pages revealed anyone's" PII or nude photographs. *Id.* at 2. Mr. Kretchmar at least acknowledges that his conduct merits sanctions, *see id.* at 3 ("Mr. Kretchmar agrees to suffer whatever sanctions this Honorable Court believes are appropriate[.]"), but his suggestion of "required continuing legal education courses" is the bare minimum this wrongdoing deserves, *id.*

In light of the above, the Court finds that Mr. Kretchmar conducted himself in bad faith when he filed unredacted PII in an unsealed document. A serious sanction is warranted given the scope of Mr. Kretchmar's initial misjudgment and subsequent conduct. Pursuant to its inherent authority to craft an appropriate sanction for a litigant's conduct, *see Mullen v. Butler*, 91 F.4th 1243, 1253 (7th Cir. 2024) (acknowledging district court's authority to "lev[y] modest fines against both attorneys and litigants for unacceptable litigation conduct"), the Court orders as follows:

> (1)     Mr. Kretchmar shall pay a fine of $9,000 to the Clerk, which represents a fine of $1,500 per woman whose nude or partially nude photographs appeared in Mr. Kretchmar's filing;

(2)     Mr. Kretchmar shall compensate Dr. Marsico's counsel for its attorneys' fees for the time it expended with respect to the emergency motion to seal;

(3)     Mr. Kretchmar shall write letters to Ware and the other women whose nude photographs appear in the cellphone data explaining and apologizing for his conduct, and send those letters by certified mail.  Mr. Kretchmar shall submit copies of these letters and mail receipts by email to this Court's courtroom deputy no later than March 31, 2025.  If Mr. Kretchmar cannot determine the identities of the women who are not parties to this litigation or find their addresses, he shall submit a letter to the Court by email to this Court's courtroom deputy explaining what efforts he took to discover their identities and addresses, and also submit the letters he would have otherwise sent the women if he were able to locate them.

(4)     No later than March 31, 2025, Mr. Kretchmar shall take a continuing legal education course on the topic of ethics and data privacy.  Mr. Kretchmar shall submit confirmation to the Court by email to this Court's courtroom deputy that he enrolled in and attended such a course.

**CONCLUSION**

The Court grants Dopson's motion for leave to file a brief in excess of fifteen pages [126]. The Court grants in part and denies in part Dopson's motion for summary judgment [126-1]. The Court grants Dr. Marsico's motion for summary judgment [123]. The Court enters judgment for Dopson against Ware on his Fourteenth Amendment claim and enters judgment for Dr. Marsico against Dopson on his Fourteenth Amendment claim. The Court grants Dr. Marsico's motion for sanctions [135] and imposes sanctions against Mr. Kretchmar as outlined in this opinion. Mr. Kretchmar must satisfy each of the sanctions no later than March 31, 2025.

Dated: January 8, 2025

SARA L. ELLIS
United States District Judge